**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (3d) 200283-U

Order filed November 9, 2020

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2020

| | | |
|---|---|---|
| *In re* A.P., a/k/a A.J., | ) | Appeal from the Circuit Court |
| | ) | of the 12th Judicial Circuit, |
| a Minor | ) | Will County, Illinois, |
| | ) | |
| (The People of the State of Illinois, | ) | |
| | ) | Appeal No. 3-20-0283 |
| Petitioner-Appellee, | ) | Circuit No. 18-JA-96 |
| | ) | |
| v. | ) | |
| | ) | |
| Anthony J., | ) | Honorable |
| | ) | Paula A. Gomora, |
| Respondent-Appellant). | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE LYTTON delivered the judgment of the court.
Justices Carter and Holdridge concurred in the judgment.

_____

**ORDER**

¶ 1　　*Held:*　Evidence supported trial court's determination that termination of father's parental rights was in the child's best interest.

¶ 2　　Respondent, Anthony J., appeals from the circuit court's order terminating his parental rights to his son, A.P., a/k/a A.J. On appeal, respondent argues that the trial court's finding that it

was in the best interest of the child to terminate his parental rights was against the manifest weight of the evidence. We affirm.

¶ 3                                              I. BACKGROUND

¶ 4         A.P. was born in January 2017. His mother and respondent, his biological father, lived together with four older children from the mother's previous relationships.

¶ 5         On May 30, 2018, the State filed a petition for adjudication of wardship. The petition alleged that A.P. was neglected in that his environment was injurious to his welfare based on (1) domestic violence in the home, and (2) his mother was incarcerated and there was no adult in the home to care for him. The trial court held an emergency shelter care hearing the same day. At the hearing, respondent stipulated to the allegations in the petition, and the trial court found that it was in the best interest of A.P. to be placed in the temporary custody of the Department of Children and Family Services (DCFS).

¶ 6         On July 19, 2018, the trial court entered an adjudication order finding A.P. neglected based on the allegations in the petition. On August 20, 2018, a dispositional order was entered finding respondent unfit and ordering him to complete services as provided in his service plan.

¶ 7         The State filed a motion to terminate respondent's parental rights on September 18, 2019. The motion alleged that respondent was unfit in that: (1) he failed to maintain a reasonable degree of interest, concern, and responsibility as to A.P.'s welfare (750 ILCS 50/1(D)(b) (West 2018)); (2) he failed to make reasonable efforts to correct the conditions which were the basis for the removal of A.P. during the period of July 19, 2018, through April 19, 2019 (750 ILCS 50/1(D)(m)(i) (West 2018)); and (3) he failed to make reasonable progress toward the return home of A.P. within nine months following the adjudication of neglect from July 19, 2018, through April 19, 2019 (750 ILCS 50/1(D)(m)(ii) (West 2018)).

¶ 8        On July 8, 2020, the trial court found that the State had proven the allegations of unfitness as set forth in the termination petition. The court entered an order finding respondent unfit. The order also noted that A.P.'s mother was deceased.

¶ 9        The best interest hearing commenced on July 17, 2020. Nancy B. testified that she had been providing foster care for A.P. and M.T., A.P.'s older brother, since they were removed from their home in May of 2018. At the time of the hearing, A.P. was 3 years old, and M.T. was 13.

¶ 10        Nancy stated that she is married and has five children. Her two oldest daughters are 20 and 18 years old and attend college. She has three boys who are 16, 14, and 8 years old. Nancy's family lives in a five-bedroom home in a suburban neighborhood with a large yard and a park nearby. A.P. shares a bedroom with her two youngest sons.

¶ 11        Nancy testified that A.P. had been living with her family for two years and one month. He was 16 or 17 months old when he came to live with them. When A.P. first arrived, he was "a very sick little boy." He had difficulty eating and sleeping. He could not swallow properly and aspirated his food, and he had obstructive sleep apnea, causing him to wake nine or ten times a night. He crawled a little bit but did not talk at all. Nancy took A.P. to all of his doctors' appointments. He was referred to six or seven specialists for sleep studies and swallowing tests. He had surgery, and he was hospitalized for respiratory syncytial virus (RSV). Nancy carried A.P. using a front infant carrier for several months because he wanted to be held "all the time." She bonded very quickly with A.P. because she carried him everywhere she went. A.P. was also enrolled in early intervention programs, including occupational therapy, physical therapy, speech therapy, and nutrition and feeding therapy. Nancy was involved in all of his therapeutic treatments.

¶ 12        Nancy stated that now, at the age of three, A.P. is a completely different child. His severe apnea has improved and he is able to sleep better. After working with a feeding therapist for a year

3

and a half, he no longer aspirates food. He is growing and thriving, and Nancy did not have to carry him anymore.

¶ 13 A.P. qualified for an individual education plan through the local school district. As soon as he turned three, he began preschool five days a week. Because of the COVID-19 pandemic, his classes have shifted to remote learning, and Nancy now works with his teachers and therapists through online "Zoom" conferences and mailed packets. She stated that even if the agency was not involved, she would be able to meet A.P.'s physical, financial, and emotional needs.

¶ 14 A.P. maintains ties with his biological family because his sibling, M.T., also lives with Nancy's family. Nancy stated that A.P. and M.T. interact with her children the same way they interact with each other. A.P. and M.T. also have a "great" relationship with their three older biological siblings. Nancy continues to foster the bonds the boys have with their biological family. Prior to COVID-19, the siblings had visits every month. Now, they see each other using Zoom chats and FaceTime calls. If Nancy adopted A.P., she would continue the relationship A.P. has with his older siblings.

¶ 15 Nancy testified that A.P. brought joy and laughter to her house. A.P loves her children, and they love him. A.P. and M.T. interact with her children the same way they interact with each other. They do not treat her children differently. Nancy "absolutely" loves A.P. If she and her husband were able to adopt A.P., they would "absolutely adopt him." Nancy stated that she has a strong and loving bond with A.P. She feels like she is his mother. A.P. calls Nancy and her husband "mom and dad." She testified that she and her husband are also willing to adopt M.T.

¶ 16 Nancy acknowledged the cultural differences between her family and A.P. She and her husband are Caucasian, while A.P. is African American. She testified that she and her husband are doing their best to learn about African American culture and to immerse A.P. into it. They have talked to them about the protests and are trying to help them understand what is happening.

¶ 17    On cross-examination, Nancy testified that she only met respondent once, at the hospital after A.P.'s surgery. A.P. has Zoom calls with respondent once a month. Nancy initiates the calls at her home and supervises A.P. She stated that there is "not a lot" of interaction between A.P. and respondent during the virtual visits.

¶ 18    Lakeisha W. is the foster parent for two of A.P.'s older sisters. She testified that her relationship with Nancy is "very good." A.P. and M.T. have visited her home for the holidays. If she adopted A.P.'s older siblings and A.P. and M.T. were adopted by Nancy's family, the children would still see each other. She stated that A.P. appears healthy. She can understand him when he talks, even though he has a slight speech impediment, and he no longer exhibits any outward appearance of a disability. She "visibly saw the difference between where he was and where he is now."

¶ 19    Natalie Bauer, a child welfare specialist with Lutheran Child and Family Services, is the supervisor for A.P.'s case. She testified that A.P. is "very bonded" with Nancy's family. It is the only family A.P. has known since he was removed from his mother's care. Bauer stated that she conducted a video chat with Nancy and A.P. a few days ago and described A.P. as "hanging all over Nancy, just kind of wanted to be next to her, just very bonded as if that's where he belongs."

¶ 20    According to Bauer's observations, A.P. exhibits "sibling love" for Nancy's children and they all appear to be "a big family." The foster parents do not treat A.P. and M.T. different from the other children. Nancy and her husband intend to adopt A.P. and M.T. In Bauer's opinion, it would be in the best interests of both minors to be adopted by their foster parents. Bauer had no safety concerns regarding the foster home. She was confident that the foster family would be able to provide for A.P.'s medical, emotional, and physical needs without agency involvement. Nancy was very good about keeping and attending all A.P.'s medical appointments, and Bauer had no reservations that she would not continue to do so.

¶ 21        Bauer testified that respondent had monthly video chats with A.P. using the Zoom online platform. The video chats started in March or April. Prior to that, they had face-to-face supervised visits. She did not note any concerns during the face-to-face visits of the Zoom visits.

¶ 22        Respondent testified that he is A.P.'s biological father. He recently moved to Hammond, Indiana, where he works as a truck driver. He has been employed with the same transportation company since 2006 and has medical insurance through his employer. A.P. would be covered under that policy. Respondent testified that, in the beginning, he had visits every weekend for about two hours. Since the COVID-19 restrictions were implemented in March, he has Zoom visits with A.P. on the first Monday of every month. They last about an hour. A.P. has a hard time focusing on the online video visits because he is only 3. Respondent loves A.P. and wants A.P. to know who he is and to know his siblings. Respondent has three other children, ages 22, 20, and 17. He testified that he is willing to care for A.P. and is capable of providing for his medical needs.

¶ 23        Following arguments, the trial court found that it was in the best interest of A.P. that respondent's parental rights be terminated. Specifically, the court found that A.P.'s physical, emotional, medical, and educational needs were met in the foster home, that A.P. had a strong bond with his foster parents and was well-integrated into the family, and that the foster families of the siblings had worked to maintained contact. The trial court entered an order terminating respondent's parental rights and giving DCFS the authority to consent to adoption.

¶ 24                                    II. ANALYSIS

¶ 25        Respondent does not challenge the court's finding that he was unfit. He argues on appeal that the trial court's finding that it was in the best interest of A.P. that his parental rights be terminated was against the manifest weight of the evidence.

¶ 26        The termination of parental rights in Illinois is a two-step statutory process. *In re K.P.*, 2020 IL App (3d) 190709, ¶ 35 (citing the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2018))

6

and the Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2018))). The court must first find a parent unfit as defined by section 1(D) of the Adoption Act. See 750 ILCS 50/1(D) (West 2018). It then determines whether a parent's rights should be terminated. See 705 ILCS 405/1-2 (West 2018). Once the trial court finds a parent unfit, all considerations must yield to the best interest of the child. *In re D.T.,* 212 Ill. 2d 347, 352 (2004).

¶ 27　　At the best interest stage, the focus shifts from the parent to the child's interest in a stable, safe, and loving home life. *Id.* In considering a child's best interest, the trial court must evaluate certain statutory factors in light of the child's age and developmental needs, including: (1) the child's physical safety and welfare, which includes food, shelter, health, and clothing; (2) the development of the child's identity; (3) the familial, cultural and religious background of the child; (4) the child's sense of attachment, including love, security, familiarity, and continuity of affection; (5) the wishes of the child; (6) the child's community ties; (7) the child's need for permanence, including stability and continuity of relationships with parental figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child. 705 ILCS 405/1-3(4.05) (West 2018). The State bears the burden of proving by a preponderance of the evidence that it is in the best interest of the child to terminate parental rights. *K.P.*, 2020 IL App (3d) 190709, ¶ 41.

¶ 28　　A reviewing court will not reverse a trial court's best interest determination unless it is against the manifest weight of the evidence. *Id.* ¶ 43. A best interest determination is against the manifest weight of the evidence only when it is clearly apparent from the record that the opposite conclusion should have been reached or that the trial court's conclusion is unreasonable, arbitrary, or not based on the evidence. *Id.*

¶ 29　　In this case, the evidence supports the trial court's best interest determination. The testimony at the best interest hearing demonstrates that the physical safety and welfare of A.P.,

7

including food, shelter, and health, were met by the foster family. A.P. had a strong bond with his foster family and loving relationship with his foster mother, Nancy. At the young age of three, A.P. had been in the continuous care of his foster parents for more than two years of his life. He was happy and thriving. His foster family loved him and wanted to adopt him. In addition, A.P. was able to remain with a biological sibling, M.T., in his current placement.

¶ 30    Conversely, the evidence showed that A.P. did not have a strong bond with respondent. Respondent had weekly supervised visits with A.P. for several months. Beginning in March 2020, respondent had once-a-month video chat visits with A.P. During those visits, their interaction did not indicate that A.P. had a familial or emotional connection to respondent. On the other hand, A.P. demonstrated a strong emotional attachment to his foster mother. She provided daily physical and emotional support and met A.P.'s unique developmental needs. A.P.'s foster family also maintained cultural ties for his benefit and encouraged ongoing contact with his older siblings. Considering the statutory factors in the context of A.P.'s age, his developmental struggles, and the need for permanence in his life, we cannot say that the trial court's decision was unreasonable or arbitrary, or that it is clearly apparent that the opposite conclusion should have been reached.

¶ 31    Based on the evidence presented, the trial court's determination that it was in A.P.'s best interest to terminate respondent's parental rights was not against the manifest weight of the evidence.

¶ 32                                III. CONCLUSION

¶ 33    The judgment of the circuit court of Will County is affirmed.

¶ 34    Affirmed.